**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE UNITED STATES OF AMERICA, COMMONWEALTH OF MASSACHUSETTS *ex rel.* MICHELLE McCORMICK,<br><br>Plaintiffs,<br><br>v.<br><br>REGALCARE REHABILITATION, LLC, STERN THERAPY CONSULTANTS, ULTIMATE THERAPY LLC, REGALCARE MANAGEMENT 2.0 LLC, REGALCARE MANAGEMENT GROUP, LLC, MAPLEWOOD OPCO, LLC, OC AZURE OF WORCESTER CENTER, LLC, RC GREENFIELD, LLC, RC HOLYOKE, LLC, 30 PRINCETON OPCO, LLC RC QUINCY, LLC, RC TAUNTON, LLC, REGALCARE AT HARWICH, LLC, SAUGUS OPCO, LLC, TWIN OAKS OPCO, LLC, ELIYAHU MIRLIS, and HECTOR CARABALLO<br><br>Defendants. | 20-cv-11805-IT<br><br>**JURY TRIAL DEMANDED** |

**RELATOR'S FIRST AMENDED COMPLAINT**

1.      Plaintiff-relator Michelle McCormick ("Relator") brings this action on behalf of herself and the United States of America and the Commonwealth of Massachusetts against the above-captioned Defendants ("Defendants") for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), and the Massachusetts False Claims Law, Mass. Gen. Laws c. 12, sec. §§ 5A *et seq.* (the "MA FCA"), to recover all damages, civil penalties and other recoveries provided for under those statutes.

## I.      INTRODUCTION

2.      For many years prior to October 1, 2019, Medicare Part A paid skilled nursing facilities ("SNFs") a daily rate to provide reasonable and necessary services to qualifying Medicare patients, which included the provision of skilled rehabilitation therapy.  The amount of this daily rate increased with the anticipated nursing and rehabilitation needs of the beneficiary. The highest daily rate that Medicare paid a SNF for rehabilitation therapy was called "Ultra High" or "Rehabilitation Ultra" ("RU").  The RU level of reimbursement was expressly intended by Medicare to apply only to the most complex cases.  Specifically, the RU level was reserved for those patients who required skilled rehabilitation therapy for a minimum of 720 minutes (12 hours) per week from at least two of the three therapy disciplines (physical, occupational, and speech therapy).

3.      Since at least 2017 and through October 1, 2019, Defendants engaged in a scheme to maximize their Medicare Part A revenue by fraudulently inflating the number of patient-days they billed at the RU level.  Defendants' corporate-wide policy was to assign nearly all of their Medicare patients to the RU level without regard to those patients' actual conditions or needs, and oftentimes in direct contradiction to those patients' best interests.

1

4.      Defendants enforced this fraudulent billing scheme using corporate policies and practices to exert pressure on the staff and therapists who treated patients in each nursing facility under their control.  This pressure even included the threat of termination of employment for employees who did not go along with their scheme.

5.      Defendants, whose managers lacked the requisite clinical qualifications and knowledge of individual patients' therapy needs to make appropriate treatment decisions, scheduled the frequency and length of skilled therapy sessions to meet the minimum requirements for billing at the highest Medicare reimbursement levels without consulting the therapists who were evaluating and treating those patients.

6.      As an intended consequence of their actions, Defendants overcharged Medicare and Medicaid for unnecessary therapy services and caused patients to receive excessive, burdensome, and often painful treatment five or six days every week to support Defendants' fraudulent claims.  This pattern of excessive treatment would last for as many days as possible of the 100-day benefit period of Medicare Part A coverage.  Massachusetts' Medicaid program ("MassHealth"), which is jointly funded by the federal government and the Commonwealth of Massachusetts, covers the 20% co-payment charged by Medicare to beneficiaries who are covered by both Medicare and MassHealth.

7.      Defendants only altered these fraudulent billing practices when the government changed its Medicare Part A skilled therapy reimbursement methodology on October 1, 2019. This change in the reimbursement methodology removed the direct financial incentives that Defendants had exploited with their scheme to bill Medicare and Medicaid for unnecessary skilled therapy services.

8.    Since October 1, 2019, Defendants have manipulated their patients' therapy sessions in other ways to maximize their profits.  Patients are now scheduled for shorter therapy sessions and these sessions often include multiple patients receiving therapy from one therapist at the same time.  Patients are discharged from therapy after much shorter periods of time, often only three weeks.

9.    A review of over 1,200 physical therapy sessions that Defendants recorded from September 2018 through November 2019 at the facility where Relator worked reflects their fraudulent practices.  A vast majority – approximately 86% – of all Medicare Part A sessions prior to October 1, 2019 were with patients assigned to the RU level of therapy, and an additional 6% of patients were assigned to the second-highest level of therapy intensity. However, once Medicare's new reimbursement framework went into effect, Defendants reduced the duration of treatment sessions from an average of 60 minutes per session to 47 minutes.  The cause for this 21% drop in session duration had nothing to do with patients' clinical conditions or medical needs, and everything to do with Defendants' single-minded focus on profits.

10.    Furthermore, since at least 2017 and continuing to the present, Defendants have manipulated the frequency and duration of therapy services provided to patients covered by Medicare Part B.  Because Medicare's reimbursement under Part B is generally lower than under Part A, Defendants directed their therapists to focus their energies on maximizing the minutes of treatment provided to Part A patients.  However, during periods when a facility's number of Part A patients was low, Defendants directed therapists to go "shopping" around the facility for patients to receive therapy under Part B, regardless of whether those patients had a clinical need for such therapy.

11.     In December 2019, Relator was asked by Defendants to perform clinical evaluations on two residents to determine if they met the medical necessity requirement to receive physical therapy services under Medicare Part A.  Both of these patients were long-term residents of the facility who Defendants had previously scheduled for the full 100-day Medicare Part A benefit period at the RU level.  Both patients had returned to the facility from hospital stays related to psychological issues that did not implicate a need for physical therapy services, and neither suffered from any other medical condition that would justify physical therapy. Relator completed her evaluations and indicated that neither patient required any physical therapy services at all.

12.     The following week, Relator received a text message from the Rehabilitation Manager for her facility directing her to "pick up" both patients for physical therapy.  This instruction was described as a "corporate mandate."  Defendants threatened Relator that they would terminate her, and hire a new physical therapist to replace her, if she did not comply.

13.     Relator performed second evaluations of both patients and noted in their medical records that neither patient had a clinical need for physical therapy, but that she had been instructed that there was a "corporate direct order" to re-evaluate them.

14.     That same afternoon, Defendants posted a job listing for Relator's position. Relator resigned shortly thereafter.

## II.      JURISDICTION & VENUE

15.     Jurisdiction is founded upon the FCA, 31 U.S.C. §§ 3729 *et seq*., specifically 31 U.S.C. §§ 3732(a) & (b) and 28 U.S.C. §§ 1331 and 1345.  This Court has supplemental jurisdiction over the MA FCA claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

16.     The Court may exercise personal jurisdiction over the Defendants because one or more of the Defendants transacts business in this District, engaged in the alleged illegal activities and practices in this District and/or is headquartered in this District.

17.     Venue in this District is appropriate under 31 U.S.C. § 3732(a), in that many of the acts complained of took place in this District.

### III.    PARTIES

**A.    The United States And The Commonwealth Of Massachusetts**

18.     The United States is a real party in interest to the claims in this action. Through the Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS"), the United States administers the Medicare and Medicaid programs.

19.     The Commonwealth of Massachusetts is a real party in interest to the claims in this action.  The Commonwealth of Massachusetts administers its Medicaid program through MassHealth.

**B.    The Relator**

20.     Relator Michelle McCormick is a physical therapist with over three decades of experience in clinical and managerial positions.  Relator's professional experience includes positions at nursing homes, and with geriatric and orthopedic healthcare providers in North and South Carolina, California, and Massachusetts.  Relator has never been terminated from any employment position and has never had a complaint filed against her with any licensing or regulatory authority.

21.     Relator worked for Defendant RegalCare in the Maplewood Center in Amesbury, Massachusetts from June 2017 until December 2019, when she resigned.

## C.    The Defendants

*RegalCare Rehabilitation LLC*

22.    Defendant RegalCare is a "therapy company that focuses exclusively on the Long Term Care industry."  Among the services that RegalCare provides are "Full Department Management," "Clinical Oversight," "Audit Services," "Ongoing Education and Training," "Fees Testing and Vital Stim Services," "Recruitment and Retention," "MDS Review/Oversight," and "Billing Support."  RegalCare Website, available at https://www.regalcarerehab.com/.

23.    RegalCare is located at 7B Medical Park Drive, Pomona, NY 10970.

24.    RegalCare owns and/or operates skilled nursing facilities in Massachusetts, Connecticut, and New York.  RegalCare Website, available at https://www.regalcarerehab.com/location/.  These locations include:

(a)    Palm Gardens Nursing and Rehabilitation, 615 Avenue C, Brooklyn, NY 11218
(b)    Heritage Center, 5606 15th Avenue, Brooklyn, NY 11219
(c)    Maplewood Center, 6 Morrill Pl., Amesbury, MA 01913
(d)    Twin Oaks Center, 63 Locust St., Danvers, MA 01923
(e)    Saugus Center, 266 Lincoln Avenue, Saugus, MA 01906
(f)    RegalCare at West Haven, 310 Terrace Ave., West Haven, CT 06516
(g)    RegalCare at Waterbury, 177 Whitewood Road, Waterbury, CT 06762
(h)    RegalCare at Torrington, 80 Fern Drive, Torrington CT 06790
(i)    RegalCare at Southport, 930 Mill Hill Terrance, Southport, CT 06890
(j)    RegalCare at New Haven, 181 Clifton Street, New Haven, CT  06513
(k)    RegalCare at Greenwich, 1188 King Street, Greenwich, CT 06831
(l)    Norwichtown Rehabilitation & Care, 93 West Town Street, Norwich, CT 06360
(m)    New London Rehab and Care, 88 Clark Lane, Waterford, CT 06385
(n)    Autumn Lake Healthcare at Norwalk, 34 Midrocks Dr., Norwalk, CT 06851

*Stern Therapy Consultants*

25.    Defendant Stern is a "consulting and management firm for all spectrums of therapy and long term care."  Among the services that Stern provides are "Full Company or

6

Facility Management," "Clinical Oversight and Audits," "Back Office Management for AP/AR,"

"Recruitment & Retention."  Stern Website, available at https://www.sternrehab.com/.

26.    Like RegalCare, Stern is located at 7B Medical Park Drive, Pomona, NY 10970.

27.    Stern provides services in at least Connecticut, Illinois, Maine, Maryland,

Massachusetts, Minnesota, New Jersey, New York, Washington, and Wisconsin.  Stern Website,

available at https://www.sternrehab.com/location/.  These locations include:

(a)    Lacon Rehab and Nursing, 401 9th St., Lacon, IL 61540
(b)    Salmon Brook Rehab and Nursing, 72 Salmon Brook Dr., Glastonbury, CT 06033
(c)    Skyview Rehab and Nursing, 35 Marc Dr., Wallingford, CT 06492
(d)    Marshall Rehabilitation, 410 N. 2nd St., Marshall, IL 62441.
(e)    Mercer Manor, 309 NW 9th Ave., Aledo, IL 61231
(f)    Autumn Lake Healthcare at Riverview, 1 Eastern Blvd., Essex, MD 21221
(g)    Autumn Lake Healthcare at Oakview, 2700 Barker Street, Silver Spring, MD 20910
(h)    Arlington West Nursing Center, 3939 Penhurst Ave., Baltimore, MD 21215
(i)    Post Acute Care Center, 5009 Frankford Ave., Baltimore, MD 21206
(j)    Premier Rehab and Skilled Nursing, 2121 Pioneer Dr., Beloit, WI 53511
(k)    Cherry Lane Nursing Center, 9001 Cherry Lane, Laurel, MD 20708
(l)    Autumn Lake Healthcare at Pikesville, 7 Sudbrook Lane, Pikesville, MD 21208
(m)    Saugus Center, 266 Lincoln Ave., Saugus, MA 01906
(n)    Twin Oaks Center, 63 Locust St., Danvers, MA 01923
(o)    Maplewood Center, 6 Morrill Pl., Amesbury, MA 01913
(o)    Autumn Lake Healthcare at Bridgepark, 4017 Liberty Heights Ave., Baltimore, MD 21207
(p)    Autumn Lake Healthcare at Greenfield, 5790 s. 27th St., Milwaukee, WI 53221
(q)    Pinnacle Health and Rehab, 26 Pleasant St., Canton, ME 04221
(r)    Northwoods Rehabilitation and Nursing Center, 7 Keeler Ave., Moravia, NY 13118
(s)    Gallatin Manor, 900 West Rave Street, Ridgway, IL 62979
(t)    Carmi Manor Rehabilitation and Nursing Center, 615 West Webb St., Carmi, IL 62821
(u)    Cumberland Manor, 154 Sunny Slope Dr., Bridgeton, NJ 08302
(v)    Lakeland Health Care Center, 25 5th Ave., Haskell, NJ 07420
(w)    Autumn Lake Healthcare at Berkeley Heights, 35 Cottage Street, Berkeley Heights, NJ 07922
(x)    Southgate Healthcare Center, 449 S. Pennsville Auburn Rd., Carneys Point Township, NJ 08069
(y)    Carneys Point Care Center, 201 5th Ave., Carneys Point Township, NJ 08069
(z)    Golden Rehabilitation and Nursing Center, 438 Salem Woodstown Rd., Salem, NJ 08079

7

(aa)   Lincoln Specialty Care Center, 1640 Lincoln Ave., Vineland, NJ 08360

(bb)   Autumn Lake Healthcare at Oceanview, 2721 Route 9, Ocean View, NJ 08230

(cc)   King David Nursing and Rehabilitation Center, 4204 Old Milford Mill Rd., Pikesville, MD 21208

(dd)   Autumn Lake Healthcare at Alice Manor, 2095 Rockrose Ave., Baltimore, MD 21211

(ee)   RegalCare at Torrington, 80 Fern Drive, Torrington, CT 06790

(ff)   RegalCare at Waterbury, 177 Whitewood Rd., Waterbury, CT 06762

(gg)   RegalCare at New Haven, Clifton Street, New Haven, CT 06513

(hh)   RegalCare at West Haven, 310 Terrace Ave., West Haven, CT 06517 181

(ii)   Rosegarden Health and Rehabilitation, 3584 East Main Street, Waterbury, CT 06705

(jj)   Autumn Lake Healthcare at Bucks Hill, 2817 North Main Street, Waterbury, CT 06704

(kk)   Norwichtown Rehabilitation & Care, 93 West Town Street, Norwich, CT 06360

(ll)   New London Rehabilitation and Care, 88 Clark Lane, Waterford, CT 06360

(mm)   Autumn Lake Healthcare at New Britain, 400 Brittany Farms Rd., New Britain, CT 06053

(nn)   Autumn Lake Healthcare at Cromwell, 385 Main St., Cromwell, CT 06416

(oo)   RegalCare at Greenwich, 1188 King Street, Greenwich, CT 06416

(pp)   Bridgeport Manor, 540 Bond St., Bridgeport, CT 06610

(qq)   Bridgeport Healthcare Center, 600 Bond St., Bridgeport, CT 06610

(rr)   RegalCare at Southport, 930 Mill Hill Terrace, Southport, CT 06610

(ss)   Autumn Lake Healthcare at Norwalk, 34 Midrocks Dr., Norwalk, CT 06851

*Ultimate Therapy LLC*

28.   Defendant Ultimate Therapy is a "therapy company that focuses exclusively on the long term care industry."  Among the services that Ultimate Therapy provides are "Full Department Management," "Clinical Oversight," "Audit Services," "Ongoing Education and Training," "Fees Testing and Vital Stim Services," "Recruitment and Retention," "MDS Review/Oversight," and "Billing Support."  Ultimate Therapy Website, available at https://www.ultimatetherapyllc.com/services/.

29.   Like RegalCare and Stern, Ultimate Therapy is located at 7B Medical Park Drive, Pomona, NY 10970.

30.   Ultimate Therapy provides services in at least the following locations:

(a)   Arlington West Nursing Center, 3939 Penhurst Ave., Baltimore, MD 21215

8

(b)     Post Acute Care Center, 5009 Frankford Ave., Baltimore, MD 21206
(c)     Premier Rehab and Skilled Nursing, 2121 Pioneer Dr., Beloit, WI 53511
(d)     Cherry Lane Nursing Center, 9001 Cherry Lane, Laurel, MD 20708
(e)     Autumn Lake Healthcare at Pikesville, 7 Sudbrook Lane, Pikesville, MD 21208
(f)     Autumn Lake Healthcare at Bridgepark, 4017 Liberty Heights Ave., Baltimore, MD 21207
(g)     Autumn Lake Healthcare at Greenfield, 5790 S. 27th St., Milwaukee, WI 53221
(h)     Cumberland Manor, 154 Sunny Slope Dr., Bridgeton, NJ 08302
(i)     Lakeland Health Care Center, 25 5th Ave., Haskell, NJ 07420
(j)     Autumn Lake Healthcare at Berkeley Heights, 35 Cottage Street, Berkeley Heights, NJ 07922
(k)     Southgate Healthcare Center, 449 S. Pennsville Auburn Road, Carneys Point, NJ 08069
(l)     Carneys Point Care Center, 201 5th Ave., Carneys Point Township, NJ 08069
(m)     Golden Rehabilitation and Nursing Center, 438 Salem Woodstown Rd., Salem, NJ 08079
(n)     Lincoln Specialty Care Center, 1640 Lincoln Ave., Vineland, NJ 08360
(o)     Autumn Lake Healthcare at Oceanview, 2721 Route 9, Ocean View, NJ 08230
(p)     King David Nursing and Rehabilitation Center, 4204 Old Milford Mill Rd., Pikesville, MD 21208
(q)     Autumn Lake Healthcare at Alice Manor, 2095 Rockrose Ave., Baltimore, MD 21211
(r)     Autumn Lake Healthcare at Bucks Hill, 2817 North Main Street, Waterbury, CT 06704
(s)     Autumn Lake Healthcare at New Britain, 400 Brittany Farms Rd., New Britain, CT 06053
(t)     Autumn Lake Healthcare at Cromwell, 385 Main St., Cromwell, CT 06053
(u)     Autumn Lake Healthcare at Norwalk, 34 Midrocks Drive, Norwalk, CT 06851

*Relationships Among the Defendants*

31.     RegalCare, Stern, and Ultimate Therapy are related companies that work in tandem or, in some cases, effectively as one company.

32.     All three companies list the same headquarters and phone number on their websites, and their websites look substantially similar.

33.     RegalCare and Ultimate Therapy describe their businesses on their websites using the exact same language ("*We are a unique therapy company that focuses exclusively on the long term care industry.*").  Their websites also contain the same exact "Mission" statement ("*Our company is committed to focusing on these important pillars that are fundamental to how we*

9

*conduct our business*.").  The list of "services" that RegalCare and Ultimate Therapy provide, according to their respective websites, is identical.

34.    Each Defendant references one or both of the other Defendants as "Partners" on their websites.[1]

35.    According to their respective websites, the three defendants also provide (unspecified) services to many of the same nursing facilities.  As illustrated in the chart below, most of the nursing facilities for which Defendants provide services receive services from more than one Defendant.

| Facility | RegalCare | Stern | Ultimate Therapy |
|---|---|---|---|
| Palm Gardens Nursing and Rehabilitation | X | | |
| Heritage Center | X | | |
| Maplewood Center | X | X | |
| Twin Oaks Center | X | X | |
| Saugus Center | X | X | |
| RegalCare at West Haven | X | X | |
| RegalCare at Waterbury | X | X | |
| RegalCare at Torrington | X | X | |
| RegalCare at Southport | X | X | |
| RegalCare at New Haven | X | X | |
| RegalCare at Greenwich | X | X | |
| Norwichtown Rehabilitation & Care | X | X | |
| New London Rehab and Care | X | X | |
| Autumn Lake Healthcare at Norwalk | X | X | X |
| Lacon Rehab and Nursing | | X | |
| Salmon Brook Rehab and Nursing | | X | |
| Skyview Rehab and Nursing | | X | |
| Marshall Rehabilitation | | X | |
| Mercer Manor | | X | |

---

[1] RegalCare's website lists "Stern Physical Rehabilitation" among its "Partners."  *See* https://www.regalcarerehab.com/partners/.  This reference to "Stern Physical Rehabilitation," links to the website for "Stern Therapy Consultants" at https://www.sternrehab.com/.  Stern's website lists "RegalCare Rehabilitation LLC" and "Ultimate Therapy" among its partners.  *See* https://www.sternrehab.com/partners/.  This reference to "Ultimate Therapy" links to ultimatetherapy.com, which is presently an internet domain for sale. Ultimate Therapy's website lists "Stern Therapy Consultants" and "RegalCare Rehabilitation LLC" among its partners.  *See* https://www.ultimatetherapyllc.com/partners/.

| | | |
|---|---|---|
| Autumn Lake Healthcare at Riverview | X | |
| Autumn Lake Healthcare at Oakview | X | |
| Arlington West Nursing Center | X | X |
| Post Acute Care Center | X | X |
| Premier Rehab and Skilled Nursing | X | X |
| Cherry Lane Nursing Center | X | X |
| Autumn Lake Healthcare at Pikesville | X | X |
| Autumn Lake Healthcare at Bridgepark | X | X |
| Autumn Lake Healthcare at Greenfield | X | X |
| Pinnacle Health and Rehab | X | |
| Northwoods Rehabilitation and Nursing Center | X | |
| Gallatin Manor | X | |
| Carmi Manor Rehabilitation and Nursing Center | X | |
| Cumberland Manor | X | X |
| Lakeland Health Care Center | X | X |
| Autumn Lake Healthcare at Berkeley Heights | X | X |
| Southgate Healthcare Center | X | X |
| Carneys Point Care Center | X | X |
| Golden Rehabilitation and Nursing Center | X | X |
| Lincoln Specialty Care Center | X | X |
| Autumn Lake Healthcare at Oceanview | X | X |
| King David Nursing and Rehabilitation Center | X | X |
| Autumn Lake Healthcare at Alice Manor | X | X |
| Rosegarden Health and Rehabilitation | X | |
| Autumn Lake Healthcare at Bucks Hill | X | X |
| Autumn Lake Healthcare at New Britain | X | X |
| Autumn Lake Healthcare at Cromwell | X | X |
| Bridgeport Manor | X | |
| Bridgeport Healthcare Center | X | |

36.     This operational interrelatedness of Defendants was observed by Relator throughout her employment with RegalCare. Relator was hired by Phil Makowsky, who she understood to work for Stern, even though her employment was formally with RegalCare. Mr. Makowsky would visit the Maplewood facility in person only rarely but communicated directives to the facility on a daily basis. Mr. Makowsky's directives concerned skilled therapy and clinical operations, even though neither he nor any other member of Defendants'

11

management with whom Relator dealt had any apparent clinical background. Mr. Makowsky reported directly to senior executives of RegalCare.

37. Relator was led to believe that at least RegalCare and Stern had shared financial ownership or interests. In her experience, both RegalCare and Stern were equally involved in the fraudulent practices that occurred at Maplewood.

*Additional Defendants*

38. Defendant RegalCare Management Group, LLC was a Delaware corporation with a principal place of business in Edison, New Jersey. RegalCare Management Group, LLC operated SNFs located in Connecticut and Massachusetts from January 1, 2017, through its date of dissolution on December 30, 2022.

39. Defendant RegalCare Management 2.0, LLC is a Delaware corporation that owned and operated nursing homes and SNFs located and operating throughout Massachusetts between March 12, 2021 to the present.

40. Defendant Maplewood OPCO LLC, d/b/a Maplewood Rehab and Nursing ("Maplewood") was a Massachusetts corporation that owned and operated a SNF located in Amesbury, MA from approximately April 1, 2018 to February 16, 2021.

41. Defendant RC Greenfield LLC, d/b/a RegalCare at Greenfield is a Massachusetts corporation that has owned and operated a SNF located in Greenfield, MA since approximately September 1, 2022.

42. 21. Defendant RegalCare at Harwich, LLC is a Massachusetts corporation that has owned and operated a SNF located in Harwich, MA since approximately December 22, 2020.

43. Defendant RC Holyoke LLC d/b/a RegalCare at Holyoke is a Massachusetts

corporation that has owned and operated a SNF located in Holyoke, MA since approximately September 1, 2022.

44. Defendant 30 Princeton OPCO LLC, d/b/a RegalCare at Lowell is a Massachusetts corporation that has owned and operated a SNF located in Lowell, MA since approximately November 1, 2022.

45. Defendant RC Quincy LLC, d/b/a RegalCare at Quincy is a Massachusetts corporation that has owned and operated a SNF located in Quincy, MA since approximately September 1, 2022.

46. Defendant RC Taunton LLC, d/b/a RegalCare at Taunton is a Massachusetts corporation that has owned and operated a SNF located in Taunton, MA since approximately September 1, 2022.

47. Defendant OC Azure of Worcester Center LLC, d/b/a RegalCare at Worcester is a Massachusetts corporation that has owned and operated a SNF located in Worcester, MA since approximately February 1, 2022.

48. Defendant Saugus OPCO LLC, d/b/a Saugus Rehab and Nursing ("Saugus") is a Massachusetts corporation that owned and operated a SNF located in Saugus, MA from approximately April 1, 2018 to February 16, 2021.

49. Defendant Twin Oaks Opco LLC, d/b/a Twin Oaks Rehab and Nursing ("Twin Oaks") is a Massachusetts corporation that owned and operated a SNF located in Danvers, MA from approximately April 1, 2018 to February 16, 2021.

50. Defendant Mirlis is a resident of the state of New Jersey and is the manager and Chief Executive Officer of RegalCare Management 2.0, LLC, and was the manager of RegalCare Management Group, LLC. According to corporate filings and the CMS nursing home ownership

13

database, he is a managing employee and holds an ownership interest in each of the RegalCare Management's SNFs and the RegalCare Massachusetts Facilities. On his website, Mirlis purports to be a nursing home administrator, but his Connecticut, New York, and New Jersey Nursing Home Administrator licenses have lapsed due to non-renewal. He has never been licensed as a Nursing Home Administrator in Massachusetts.

51.     While Mirlis testified that he did not receive compensation from RegalCare Management, he did "take draws from some of my companies, or loans or distributions if there's money there."

52.     Defendant Caraballo is a resident of the state of Connecticut and is the Vice President of Clinical Reimbursement and Minimum Data Set ("MDS") for RegalCare Management 2.0, LLC and previously held that position for RegalCare Management Group, LLC. Caraballo is licensed as a practical nurse in Connecticut.

53.     Relator incorporates by reference into this First Amended Complaint paragraphs 50-60, 119-163, 164-182, and Exhibits 1 and 2, from the United States and Commonwealth of Massachusetts' Complaint in Intervention.

54.     Due to the interrelated nature of Defendants, allegations in this complaint that refer to "Defendants" are alleged against each Defendant individually and all Defendants to the extent they operate in a coordinated manner.

## IV.  LEGAL BACKGROUND

### A.     The Federal FCA And The MA FCA

55.     The federal FCA imposes liability on any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

14

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C)     conspires to commit a violation of subparagraph (A) [or] (B) …;  [or]

* * *

(G)     knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]

31  U.S.C. §§ 3729(a)(1)(A), (B), (C) & (G).

56.     The term "knowingly" means "that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  Proof of specific intent to defraud is not required. *See* 31 U.S.C. § 3729(b)(1)(B).

57.     Section 3729(a)(1) of the FCA provides that a person is liable to the United States for three times the amount of damages which the Government sustains because of the act of that person, plus civil penalties.  The FCA civil penalties are $5,500 to $11,000 for violations occurring from September 29, 1999 to August 1, 2016; $10,781 to $21,563 for violations occurring from August 2, 2016 to February 3, 2017; $10,957 to $21,916 for violations occurring from February 4, 2017 to January 29, 2018; $11,181 to $22,363 for violations occurring from January 30, 2018 to June 19, 2020; and $11, 665 to 23,331 for violations occurring thereafter. *See* 28 C.F.R. §§ 85.3 & 85.5; 85 Fed. Reg. 37004 (June 19, 2020).

58.     The MA FCA has liability provisions similar to those under the federal FCA, imposing liability on any person who:

(1)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

15

(2)    knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim;

(3)    conspires to commit a violation of this subsection;

***

(9)    knowingly makes, uses or causes to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof; or

(10)    is a beneficiary of an inadvertent submission of a false claim to the commonwealth or a political subdivision thereof, or is a beneficiary of an overpayment from the commonwealth or a political subdivision thereof, and who subsequently discovers the falsity of the claim or the receipt of overpayment and fails to disclose the false claim or receipt of overpayment to the commonwealth or a political subdivision by the later of: (i) the date which is 60 days after the date on which the false claim or receipt of overpayment was identified….

Mass. Gen. Laws c. 12, sec. 5B(a).

59.    The MA FCA provides for civil penalties of not less than $5,500 and not more than $11,000 per violation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101–410 section 5, 104 Stat. 891, note following 28 U.S.C. section 2461, plus 3 times the amount of damages, including consequential damages, that the commonwealth or a political subdivision thereof sustains because of such violation..  Mass. Gen. Laws c. 12, sec. 5B(a).

**V.    MEDICARE AND MEDICAID SKILLED NURSING FACILITY COVERAGE**

**A.    Medicare And Medicaid Coverage Of Rehabilitation Therapy**

60.    Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions.  *See* 42 U.S.C. §§ 426, 426a.

16

61.     The Medicare program is divided into four "Parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

62.     Medicare Part B generally covers outpatient physician services, which include skilled therapy.

63.     Medicaid is a government health insurance program for the poor that is jointly funded by the federal and state governments. *See* 42 U.S.C. §§ 1396 *et seq.* Each state administers its own Medicaid program. However, each state program is also governed by federal statutes, regulations, and guidelines. The federal portion of each state's Medicaid payment – the Federal Medicaid Assistance Percentage – is based on that state's per capita income compared to the national average. If a beneficiary is dually-eligible for both Medicare and Medicaid, their state's Medicaid program will often cover Medicare co-insurance or co-payment amounts related to skilled therapy. Accordingly, each state Medicaid program that covers dual-eligible patients is a "grantee" of federal funds under the FCA. 31 U.S.C. § 3729(b)(2)(A)(ii). Therefore, when these state programs cover patients' co-insurance or co-payments, false claims submitted for payments may give rise to FCA liability.

64.     Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

65.     In order for rehabilitation therapy provided in a skilled nursing facility ("SNF") to be covered by Medicare Part A, the following conditions must be met: (1) the patient must require skilled nursing care or skilled rehabilitation services (or both) on a daily basis; (2) the daily skilled services must be services that, as a practical matter, can only be provided in a

17

skilled nursing facility on an inpatient basis; and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay, or for a condition that arose while the patient was receiving care in a SNF (for a condition treated during the hospital stay).  42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

66.     Medicare requires that a physician or certain other practitioners certify that these requirements are met at the time of a patient's admission to the SNF and re-certify the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter.  *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3; Medicare Benefit Policy Manual, Ch. 15 § 220.1.3.

67.     Skilled therapy services are also a covered benefit under Medicare Part B, meaning that CMS will reimburse under Part B for therapy services that are reasonable and necessary.  Medicare Benefit Policy Manual, Ch. 15 § 220.1.

68.     Outpatient (Part B) therapy services are covered when the services are required because the individual needed therapy services, a plan for furnishing such services has been established by a physician, nurse practitioner, or therapist and is periodically reviewed by a physician or nurse practitioner, services are furnished while the individual is under the care of a physician, and all applicable requirements for claims submission are met.  *Id.*

69.     For a therapy service to be considered skilled, it must be "so inherently complex that it can safely and effectively be performed only by, or under the supervision of, professional or technical personnel."  42 C.F.R. § 409.32(a).  Thus, skilled therapy services can only be administered by, or under the supervision of, trained personnel such as physical therapists, occupational therapists, or speech language pathologists.  *See* 42 C.F.R. § 409.31(a).

18

70.     Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitive exercises (*e.g.*, exercises to improve gait, maintain strength or endurance, or assistive walking).  *See* 42 C.F.R. § 409.33(d); *see also* Medicare Benefit Policy Manual, Ch. 8 § 30.4.1.1 ("Skilled physical therapy services must … be of a level of complexity and sophistication, or the condition of the patient must be of a nature that requires the judgment, knowledge, and skills of a qualified physical therapist.").

71.     Medicare will only cover those services that are "reasonable" and "necessary." *See* 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under part A or part B of this subchapter for any expenses incurred for items or services … which … are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member.").

72.     In the context of skilled rehabilitation therapy, "reasonable" and "necessary" means that the services must be: (1) consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; (2) consistent with accepted standards of medical practice; and (3) reasonable in duration and quantity.  *See* Medicare Benefit Policy Manual, Ch. 8 § 30.

73.     In order to assess the reasonableness and necessity of skilled rehabilitation therapy services and determine whether reimbursement is appropriate, Medicare requires as a condition of payment proper and complete documentation of the services rendered to beneficiaries.  In particular, the Medicare statute provides that:

> The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or

19

settlement by the Government Accountability Office, from the Federal Hospital Insurance Trust Fund, the amounts so determined, with necessary adjustments on account of previously made overpayments or underpayments; *except that no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.*

42 U.S.C. § 1395g(a) (emphasis added).

74.    Medicare's reimbursement requirements for skilled therapy are consistent with the ethical guidelines for physical therapists promulgated by the American Physical Therapy Association.  These guidelines provide that:

- "Physical therapists shall demonstrate independent and objective professional judgment in the patient's/client's best interest in all practice settings."

- "The physical therapist shall establish the plan of care and shall provide and/or supervise and direct the appropriate interventions."

- "Regardless of practice setting, the physical therapist has primary responsibility for the physical therapy care of a patient or client and shall make independent judgments regarding that care consistent with accepted professional standards."

- "The physical therapist shall determine when a patient or client will no longer benefit from physical therapist services.  When the physical therapist's judgment is that a patient will receive negligible benefit from physical therapist services, the physical therapist shall not provide or continue to provide such services if the primary reason for doing so is to further the financial self-interest of the physical therapist or his or her employer.  The physical therapist shall avoid overutilization of physical therapist services."

"Guide for Professional Conduct," American Physical Therapy Association (rev. March 2019).

**B.    Medicare Payment For SNF Rehabilitation Therapy**

75.    For many years prior to October 1, 2019, under its prospective payment system ("PPS"), Medicare paid a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provided to a patient.  *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

20

76.     The daily PPS rate that Medicare paid a nursing facility depended, in part, on the Resource Utilization Group ("RUG") to which a patient was assigned.  Each distinct RUG was intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.  Effective October 1, 2010, there were 66 total RUG levels.

77.     In general, there were five RUG levels for patients who require rehabilitation therapy:  Rehabilitation Ultra High ("RU"); Rehabilitation Very High ("RV"); Rehabilitation High ("RH"); Rehabilitation Medium ("RM"); and Rehabilitation Low ("RL").

78.     The RUG level to which a patient was assigned depended upon both the number of skilled therapy minutes and the number of therapy disciplines the patient received during a seven-day assessment period.  The following chart reflects the requirements for the five rehabilitation RUG levels.

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra High | 1.  Minimum 720 minutes per week total therapy<br>2.  At least two therapy disciplines<br>3.  One discipline must be provided at least 5 days/week |
| RV = Very High | 1.  Minimum 500 minutes per week total therapy<br>2.  One therapy discipline must be provided at least 5 days/week |
| RH = High | 1.  Minimum 325 minutes per week total therapy<br>2.  One therapy discipline must be provided at least 5 days/week |
| RM = Medium | 1.  Minimum 150 minutes per week total therapy<br>2.  Therapy must be provided at least 5 days/week<br>3.  Can be any mix of therapy disciplines |
| RL = Low | 1.  Minimum 45 minutes per week total therapy<br>2.  Therapy must be provided at least 3 days/week<br>3.  Can be any mix of therapy disciplines |

Source:  63 Fed. Reg. at 26,262.

79.    Medicare paid the highest rate for those beneficiaries that fall into the RU level. This level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time."  63 Fed. Reg. 26,252, 26,258 (May 12, 1998).

**C.    Medicare Claims For Payment Of SNF Rehabilitation Therapy**

*The Resource Utilization Group (RUG) Framework*

80.    Medicare required SNFs to periodically assess each patient's clinical condition and functional status, as well as their actual and expected use of services.  SNFs were required to report the result of these assessments using a standardized tool known as the Minimum Data Set ("MDS").  The MDS was used as the basis for determining a patient's RUG level and, therefore, the daily rate that Medicare will pay the SNF to provide skilled nursing and skilled therapy to the patient.

81.    In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's stay in the facility.  The date the facility performs the assessment is known as the "assessment reference date."  A nursing facility may perform the assessment within a window of time before each "reference date" or, under certain circumstances, up to five days after.  When a nursing facility performs its assessment (except for the first assessment), it  observes the patient for the seven days preceding the assessment reference date.  The seven-day assessment period is referred to as the "look-back period."

82.    The "Special Treatments and Procedures" section of the MDS required a SNF to report the number of minutes of skilled rehabilitation therapy the facility provided to a patient during the look-back period as well as the type(s) of therapy provided.  In particular, a SNF had to report in the Special Treatments and Procedures section the number of days and minutes of therapy the SNF provided to a patient in each of the following skilled rehabilitation therapy

22

disciplines:  Physical therapy, occupational therapy, and speech-language pathology.  This information directly impacted the RUG level assigned to each patient and therefore the amount of reimbursement that the SNF would receive for that patient.

83.    In most instances, the RUG level assigned to a patient determined Medicare payment prospectively for a defined period of time.  *See* 63 Fed. Reg. at 26, 267.  For example, if a patient is assessed on day 14 of his stay and received 720 minutes of therapy during days 7 through 14 of the stay, then the facility was  paid for the patient at the RU RUG level for days 15 through 30 of the patient's stay.

84.    Since October 1, 2010, nursing facilities have transmitted the MDS form electronically directly to CMS.  41 C.F.R. § 483.20(f)(3).

85.    Completion of the MDS is a prerequisite to payment under Medicare.  *See* 63 Fed. Reg. at 26,265.

86.    The MDS form requires a certification by the provider that states, in part:

> To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements.  I understand this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds."  MDS Versions 2.0 and 3.0 for Nursing Home Resident Assessment and Care Screening."

87.    A patient's RUG information was incorporated into the Health Insurance Prospective Payment System ("HIPPS") code, which Medicare used to determine the payment amount owed to the nursing facility.  The HIPPS code must be included on the CM-1450, which nursing facilities submit electronically to Medicare for payment.  Medicare Claims Processing Manual, Ch. 25 § 75.5.  Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450.  *See* 63 Fed. Reg. at 26,267; Medicare Claims Processing Manual. Ch. 25 § 75.5.

*The Patient Driven Payment Model (PDPM) Framework*

88.     Effective October 1, 2019, CMS replaced the RUG PPS payment methodology with a new case-mix classification model, the Patient Driven Payment Model ("PDPM").

89.     CMS has moved to the PDPM in part to "improve[] payment accuracy and appropriateness by focusing on the patient, rather than the volume of services provided."  CMS, "SNF PPS: Patient Driven Payment Model" at 6, available at https://www.cms.gov/Outreach-and-Education/Outreach/NPC/Downloads/2018-12-11-SNF-PPS-PDPM.pdf.

90.     The PDPM uses patient characteristics to predict the necessary therapy costs associated with treating each patient and calculates reimbursement amounts to providers accordingly.  *Id.*  While the RUG framework determined reimbursement amounts based on the number of minutes of therapy provided to a patient, the PDPM framework determines reimbursement amounts by using patient characteristics to predict the therapy costs associated with treating that patient.  *Id.* at 14.

91.     The calculation of the amount of Medicare reimbursement under PDPM is driven by five case-mix adjusted components – Physical Therapy, Occupational Therapy, Speech Language Pathology ("SLP"), Nursing, and Non-Therapy Ancillary ("NTA") – and a "Variable Per Diem (VPD)" adjustment that adjusts the per diem reimbursement rate during the period of a patient's nursing facility stay.  *Id.* at 8.

92.     The PDPM framework places each patient into a classification group for each of the five case-mix adjusted components based on specified criteria.  For physical therapy and occupational therapy, this classification considers a patient's "clinical category" and "functional score."  For SLP, this classification considers a patient's conditions in the following areas:

24

presence of acute neurologic condition, SLP-related comorbidity or cognitive impairment, mechanically-altered diet, and swallowing disorder.  *Id.* at 13.

93.     The transition to PDPM also involved a change in how Medicare reimbursed for concurrent therapy sessions (involving one therapist and two patients doing different activities) and group therapy sessions (involving one therapist with multiple patients doing the same or similar activities).  While under the RUG framework, there was no limit on concurrent therapy and a limit of 25% on the amount of group therapy that would be reimbursed for each discipline, under the PDPM framework there is a combined limit of 25% on the amount of concurrent and group therapy that will be reimbursed per patient per discipline.  *Id.* at 62.

## VI.  FACTUAL ALLEGATIONS

**A.     Defendants Provided Unnecessary And Excessive Therapy To Medicare Beneficiaries And Submitted Fraudulent Claims For That Therapy To Medicare**

94.     From at least the time when Relator began working for Defendants in 2017, Defendants have successfully utilized corporate policies and practices to pressure managers and individual therapists to provide excessive, unnecessary, and potentially harmful skilled therapy to nursing home residents.

95.     Defendants provide skilled therapy services to nursing facilities that they either own or with which they enter into contractual arrangements.  At present, Defendants own, operate, or are contracted to provide services in approximately 50 facilities across the country.

96.     The majority of patients at facilities where Defendants provide therapy are covered by Medicare.

97.     Defendants manage their skilled therapy caseloads with a goal of maintaining as many patients as possible at the highest treatment level of Ultra High (RU).  Nearly all of the patients that are not at the RU level are maintained at the second-highest level of RV.  There is

25

nothing distinctive about Defendants' patient population that would justify its nursing facilities assigning the overwhelming majority of their patients to the RU level of skilled therapy.

98.    The daily therapy schedules at the Maplewood facility where Relator worked, including the specification of the number of minutes of therapy per patient per session, were set not by the patients' treating therapists but instead by the RegalCare "Rehab Manager," Christopher Braid.

99.    Mr. Braid was overseen by Mr. Makowsky, formally of Stern, who similarly oversaw other RegalCare Rehab Managers at other facilities.

100.    Mr. Makowsky reported to senior management at RegalCare, who had ultimate authority for determining the number of minutes of skilled therapy that each patient under Defendants' care would receive.

101.    It was Defendants' policy to place all patients covered by Medicare Part A on the highest therapy intensity level (RU) and to keep those patients at that level for as many days as possible even though such extended "lengths of stay" were rarely reasonable or necessary. Medicare Part A will generally cover up to 100 days of skilled therapy per qualifying episode. Defendants routinely sought to maintain their Medicare Part A patients at the RU level for the full 100 days.

102.    Defendants' practice of assigning all or virtually all Medicare Part A patients to the RU level was driven entirely by financial concerns. The clinical input and recommendations of treating therapists was ignored by Defendants. Similarly, Defendants ignored the physical or mental tolerance of patients to endure such excessive treatment.

103.    If any minutes were "missed" during a patient's treatment session, those minutes were required to be "made up" the following day. The only exceptions were if the patient died

26

or went to the hospital.  If a patient was sick, or at dialysis, or in a vulnerable physical condition, Defendants' managers would mandate the minutes be made up and pressure therapists with comments such as "other disciplines got the minutes, why can't you?" or "you will have to work Saturday if your minutes are not done."

104.    On the other hand, if a patient received more minutes of therapy than were scheduled in a particular session, Defendants reduced the scheduled minutes of that patient's therapy for later in the week with the goal of having the patient's weekly minutes exactly equal the minimum number of minutes for the RU threshold.  These schedule changes were commonly made with such precision that patients would not receive even one minute of therapy in excess of the RU threshold.  Defendants' scheduling practices stand in direct contradiction to the framework of Medicare's RUG reimbursement methodology, which sets payment amounts for each RUG level based on the *average* length of therapy provided to patients at that level, not based on the absolute minimum length of therapy to qualify for that level.[2]

105.    Therapists regularly protested what they knew to be excessive levels of scheduled treatment and in response were threatened by Defendants' managers with a reduction in their hours (and pay) or even outright termination of their employment.  Managers would tell therapists that "you are easily replaceable," and intimidate them by threatening to "write them up" or saying that "Phil [Makowsky] is coming to the facility today and is not happy."  Similar statements made to therapists included, to "do your job," "do you understand the financial

---

[2] *See* Fed. Reg. 47,962 (Aug. 6, 2013) ("Therapy reimbursement for each RUG is based on the average utilization between the thresholds, so those at the minimum thresholds are, in fact, being adequately paid relative to the average resource amount used to determine the reimbursement level.  [Where] the number of therapy minutes provided to beneficiaries cluster at the minimum amount necessary to qualify for a given RUG group …. the resource intensity used to determine the reimbursement for that RUG group is greater than the resource intensity of the therapy provided to the resident.")

27

piece," "you want a paycheck, right?,"  "Therapists are a dime a dozen," and "we could get someone a lot cheaper than you."

106.    Although Defendants commonly threatened therapists with such warnings, they were careful not to make these threats in writing.  Even when therapists asked to receive these directives in writing, Defendants' managers refused.

107.    Defendants also pressured facility managers and therapists by creating a competitive culture in which facilities were judged against others in Defendants' chain based on which facilities had the highest percentage of residents at the RU level and for the longest periods of time.  At Relator's facility, she regularly heard comments from Defendants' managers such as that another facility "is beating us in minutes and Med A," and "we need to step it up or Phil [Makowsky] is going to bring down the hatchet."

108.    Defendants' fraud resulted in inflated claims for Medicare (and Medicaid for dual-eligible beneficiaries) reimbursement and caused harm to patients who were not given treatment that was rationally related to their medical conditions and physical limitations .  Many patients treated by Defendants at the RU level were too old or too weak for that intensity of treatment.

**B.     When Medicare Changed Reimbursement Methodologies, Defendants Immediately Responded By Changing the Amount And Nature Of Skilled Therapy That They Claimed Was Medically Reasonable And Necessary And Billed To Medicare**

109.    With the advent of Medicare's PDPM payment methodology on October 1, 2019, Defendants were no longer financially incentivized to provide 720 minutes of skilled therapy to each patient every week for 100 days as they were under the RUG framework.

110.    As soon as the PDPM framework went into effect, Defendants immediately altered their fraudulent scheme in order to continue to maximize their profits from Medicare

reimbursement.  As under the RUG framework, Defendants' new approach used patients merely as means to an end and provided amounts and types of therapy services driven only by profit and not by patients' actual medical needs.

111.   The number of minutes scheduled per therapy session dropped from up to 75 under the RUG system to around 40 under PDPM.

112.   In addition, Defendants began to limit skilled therapy treatment for Medicare Part A patients to approximately 21 days, rather than trying to keep every Part A patient on skilled therapy for up to 100 days.  After 21 days, Defendants would discharge many patients from therapy regardless of their progress or continuing needs because PDPM reimbursement would begin to decrease after the 21st day of treatment.

113.   These dramatic changes were instantaneous upon Medicare's switch to PDPM, which alone demonstrates that they were not a result of patient improvement or any clinical factor at all.  Indeed, patient medical records will not reflect that any widespread improvement of patient conditions or change in need for skilled therapy occurred coincidentally at the time that Medicare changed reimbursement methods.

114.   Defendants made another change to their provision of therapy under PDPM. While group therapy was systematically avoided under the RUG system in order to maximize individual patient treatment minutes and reimbursement, both group and concurrent therapy have sharply increased under PDPM.

115.   Defendants now regularly schedule Medicare patients for group or concurrent therapy as a matter of course, regardless of whether such manner of therapy is appropriate for any particular patient.  Defendants commonly schedule groups of up to six patients to receive physical or occupational therapy at the same time.

29

116.    Federal regulations note that:  "individual therapy is the preferred mode of therapy provision and offers the most tailored service for patients….while group therapy can play an important role in SNF patient care, group therapy is not appropriate for either all patients or for all conditions, and is primarily effective as a supplement to individual therapy, which we maintain should be considered the primary therapy mode and standard of care in therapy services provided to SNF residents."  84 Fed. Reg. 38746 (Aug. 7, 2019).

117.    Federal regulations continue:

> [W]hen group therapy is used in a SNF, therapists must document its use in order to demonstrate why it is the most appropriate mode of therapy for the patient who is receiving it. As stated in the FY 2012 SNF PPS proposed rule (76 FR 26388) regarding group therapy documentation, because group therapy is not appropriate for either all patients or all conditions, and in order to verify that group therapy is medically necessary and appropriate to the needs of each beneficiary, SNFs should include in the patient's plan of care an explicit justification for the use of group, rather than individual or concurrent, therapy. This description should include, but need not be limited to, the specific benefits to that particular patient of including the documented type and amount of group therapy; that is, how the prescribed type and amount of group therapy will meet the patient's needs and assist the patient in reaching the documented goals. In addition, we believe that the above documentation is necessary to demonstrate that the SNF is providing services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident in accordance with section 1819(b)(2) of the Act.

84 Fed. Reg. 38746 (Aug. 7, 2019).

118.    Relator noticed that in October 2019, as soon as the PDPM framework went into effect, Defendants changed their internal electronic form for evaluating patients' therapy needs. The electronic form that was used prior to October 2019 did not include any specific line item relating to group therapy, which was consistent with Defendants' reluctance to utilize group therapy during that time.  However, starting October 1, 2019, Defendants changed their electronic form to require that the evaluating therapist indicate whether or not group therapy would be clinically appropriate for that patient.  Defendants' electronic program would not allow a therapist to complete an evaluation without providing this information.

119.    On numerous instances when Relator performed evaluations using the new form, she indicated that in her clinical judgment a patient was not appropriate for group therapy but Defendants nevertheless scheduled that patient for group therapy.

120.    This change in Defendants' utilization of group and concurrent therapy inflates their profits in two ways.  First, it maximizes their profit margins under PDPM by billing only for services in a type and length that provide the greatest financial benefit.  Second, it allows Defendants to drastically reduce their costs of providing therapy services because their therapists are generally paid hourly.  While individual therapy sessions (under the RUG framework) required Defendants to pay therapists for one hour for each hour of therapy they provide to a patient, group or concurrent therapy sessions allow Defendants to pay therapists for one hour to provide an hour of therapy to up to six patients.

C.    **An Analysis Of Defendants' Records Covering Over 1,200 Patient Therapy Sessions At the Maplewood Facility Demonstrates That Defendants Systematically Inflated Their Services Under The RUG Framework And Have Sharply Reduced Services Under The PDPM Framework**

121.    Relator has performed an analysis of Defendants' records of over 1,200 patient therapy sessions at the Maplewood facility for physical therapy services that occurred between September 2018 and November 2019.  This analysis corroborates that Defendants systematically inflated their therapy services under Medicare's RUG framework and then sharply reduced the services it has provided to patients under the PDPM framework.

122.    These records include 513 in which a patient's RUG level was identified.  Of these, 442 records – 86% of the total – indicated the patient was assigned therapy at the RU level.  An additional 30 records indicated the patient was assigned the second-highest level (RV), combining to indicate that 92% of the total records on which a RUG level was identified were at the RU or RV level.

123.    Out of the 513 records in which a RUG level was identified, not a single record indicated that the patient was being treated at the lowest of the five RUG levels (RL).

124.    The chart below illustrates the distribution of these 513 records across the four RUG levels that were indicated for the patients they concern.



125.    These records also document that Defendants' practice of dramatically inflating their therapy services to maximize reimbursement under the RUG framework came to an immediate end in October 2019 with the switch to the PDPM framework.

126.    From September 2018 through September 2019, the records analyzed by Relator reflect that therapy sessions were scheduled for Medicare Part A patients at an average of 60 minutes in length.  In October and November of 2019, the average length of Defendants' sessions for Part A patients dropped to 47 minutes.

127.    There is no reason other than the change in Medicare reimbursement methodology that can credibly explain why, starting on October 1, 2019, all of Defendants' patients at the Maplewood facility suddenly required 21% less therapy per session.

128.    In addition, these records include 23 sessions in which therapy was provided in a group environment.  Twenty-two of these group sessions occurred in the month of October 2019, and only one occurred in the year from September 2018 to September 2019.

129.    While Medicare's reimbursement calculations changed on October 1, 2019, Defendants' obligations to provide the type and amount of skilled therapy that were reasonable and necessary for the medical treatment of their patients did not.  Both before and after October 1, 2019, Defendants have manipulated their treatment of patients solely to increase their profits.

**D.    Defendants Billed For Unnecessary Therapy Services To Medicare Part B Patients To Increase Their Revenue When The Number Of Part A Patients In A Facility Was Low**

130.    Residents in skilled nursing facilities who are covered by Medicare and require skilled therapy but have not had a qualifying hospital stay or met other prerequisites for Part A benefits may receive skilled therapy under Medicare Part B.  Skilled therapy under Part B is governed by a different reimbursement structure than under Part A.  In general, Part B will cover a certain number of "units" of therapy per patient per week.  A "unit" of therapy is expected to reflect an average of 15 minutes of treatment.

131.    Because of this different reimbursement structure, Part B is less profitable to Defendants than Part A.  Defendants therefore direct their employees to focus on maximizing the Medicare reimbursement that they obtain under Part A.

132.    For example, when a new patient is evaluated for therapy services, Defendants will schedule that patient for a 15 minute evaluation followed by treatment on that same day.  If

33

the patient is covered by Part A, the subsequent treatment will be scheduled for 75 minutes.  If the patient is covered by Part B, the subsequent treatment will be scheduled for only 25 minutes.

133.    The scheduling of Part B sessions for exactly 25 minutes was also done to maximize profits.  Since Medicare reimburses for therapy services under Part B in increments of 15-minute "units," therapy sessions that last 25 minutes can bill for 2 units.  Defendants manipulated the scheduled minutes of Part B sessions with the goal of performing as little therapy as needed to obtain the next "unit" of reimbursement.  Part B therapy sessions were typically billed in 25, 40, and 55-minute increments.

134.    While Defendants focused on maintaining nearly all their Part A patients at the RU level, when the "caseload," or number of patients at a facility receiving skilled therapy, is low Defendants will direct their employees to increase their provision of therapy to Part B patients.  This increase in the provision of skilled therapy to Part B patients was not the result of any change to that patient population's clinical conditions or medical needs, but was done only to increase Defendants' reimbursements from Medicare.

135.    Relator was personally subject to Defendants' pressure in this regard.  When the Maplewood facility had a low Part A caseload, she and other therapists were told to "go Med B shopping."  Defendants used this phrase to refer to their practice of adding Part B patients and sessions to their therapy schedule during times of lower Part A billing.

**E.      Defendants Pressured Relator To Perform Unnecessary Therapy On Patients That Did Not Need And Could Not Tolerate Such Therapy And She Resigned As A Result**

136.    As part of her job responsibilities, Relator regularly performed evaluations of residents at the Maplewood facility to determine whether they were in need of skilled physical therapy services.

137.    In early December 2019, Relator was asked by Defendants to perform clinical evaluations on two residents to determine if they met the medical necessity requirement to receive physical therapy services under Medicare.  Even under the PDPM reimbursement model then in effect, Defendants stood to profit by assigning residents to receive physical therapy services.

138.    Both of these patients were long-term residents of the facility who Defendants had previously scheduled for the full 100-day Medicare Part A benefit period at the RU level.  Both patients had returned to the facility from hospital stays related to psychological issues that did not implicate a need for physical therapy services, and neither suffered from any other medical condition that would justify physical therapy.

139.    Relator completed her evaluations on December 3, 2019, and indicated that neither patient required any physical therapy services at all.

140.    One of these residents was very ill and likely in the process of dying.  This patient's family had requested that he not be placed on hospice care because they would be financially responsible for his room and board.  This resident's vulnerable condition rendered him unable to tolerate skilled physical therapy services.

141.    The following week, on December 10, 2019, Relator received a text message from Mr. Braid, the Rehabilitation Manager for her facility, directing her to "pick up" both patients for physical therapy.  This instruction was described to her verbally as a "corporate mandate."

142.    Defendants threatened Relator that they would terminate her, and hire a new physical therapist to replace her, if she did not comply.

143.    Relator was told that one of these residents must be given skilled therapy, even if the only task that was performed was "positioning."  Relator was harassed with statements like "why can't you just go along?  Play the game or you'll get fired."  She was told that corporate was involved and that senior executives at RegalCare were pressuring Mr. Makowsky.

144.    Both patients were added to Relator's schedule on that same day for re-evaluation.

145.    Relator performed second evaluations of both patients on December 11, 2019, and noted in their medical records that neither patient had a clinical need for physical therapy, but that she was instructed that there was a "corporate direct order" to re-evaluate them for physical therapy regardless of need.

146.    That same afternoon, Defendants posted online a job description for Relator's position.  Relator resigned shortly thereafter.

## VII. COUNTS

### Count I
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

147.    Relator re-alleges and incorporates each allegation in each of the preceding paragraphs as if fully set forth herein and further alleges as follows:

148.    By virtue of the acts described above, Defendants "knowingly present[ed], or caus[ed] to be presented, false or fraudulent claims for payment or approval" in violation of 31 U.S.C. § 3729(a)(1)(A).

149.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

36

**Count II**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

150.    Relator re-alleges and incorporates each allegation in paragraphs 1 through 131 as if fully set forth herein and further alleges as follows:

151.    By virtue of the acts described above, Defendants have "knowingly ma[de], us[ed], or caus[ed] to be made or used, a false record or statement that was material to false or fraudulent claims" in violation of 31 U.S.C. § 3729(a)(1)(B).

152.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**Count III**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(C)**

153.    Relator re-alleges and incorporates each allegation in paragraphs 1 through 131 as if fully set forth herein and further alleges as follows:

154.    By virtue of the acts described above, Defendants have "conspire[d] to commit a violation of subparagraph[s] (A), (B), … or (G)," in violation of 31 U.S.C. § 3729(a)(1)(C).

155.    The United States, unaware of the foregoing circumstances and conduct, and in reliance on the truth and accuracy of the claims for payment, paid or authorized payment of those claims and has been damaged in an amount to be proven at trial.

**Count IV**
**Federal False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**

156.    Relator re-alleges and incorporates each allegation in paragraphs 1 through 131 as if fully set forth herein and further alleges as follows:

37

157.    By virtue of the acts described above, Defendants have "knowingly and improperly avoid[ed] or decreas[ed] an obligation to pay or transmit" money to the United States in violation of 31 U.S.C. § 3729(a)(1)(G).

### Count V
### Massachusetts False Claims Law
### Mass. Gen. Laws c. 12, sec. 5B(a)(1)

158.    Relator re-alleges and incorporates each allegation in paragraphs 1 through 131 as if fully set forth herein and further alleges as follows:

159.    By virtue of the acts described above, Defendants have "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" in violation of Mass. Gen. Laws c. 12, sec. 5B(a)(1).

160.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

161.    Pursuant to Mass. Gen. Laws c. 12, sec. 5B(a), the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus a penalty of $5,500 to $21,563 per violation.

### Count VI
### Massachusetts False Claims Law
### Mass. Gen. Laws c. 12, sec. 5B(a)(2)

162.    Relator re-alleges and incorporates each allegation in paragraphs 1 through 131 as if fully set forth herein and further alleges as follows:

163.    By virtue of the acts described above, Defendants have "knowingly ma[de], use[d] or cause[d] to be made or used a false record or statement material to a false or fraudulent claim," in violation of Mass. Gen. Laws c. 12, sec. 5B(a)(2).

164.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

165.    Pursuant to Mass. Gen. Laws c. 12, sec. 5B(a), the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus a penalty of $5,500 to $21,563 per violation.

### Count VII
### Massachusetts False Claims Law
### Mass. Gen. Laws c. 12, sec. 5B(a)(3)

166.    Relator re-alleges and incorporates each allegation in paragraphs 1 through 131 as if fully set forth herein and further alleges as follows:

167.    By virtue of the acts described above, Defendants have "conspire[d] to commit a violation" of the MA FCA in violation of Mass. Gen. Laws c. 12, sec. 5B(a)(3).

168.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

169.    Pursuant to Mass. Gen. Laws c. 12, sec. 5B(a), the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus a penalty of $5,500 to $21,563 per violation.

### Count VIII
### Massachusetts False Claims Law
### Mass. Gen. Laws c. 12, sec. 5B(a)(9)

170.    Relator re-alleges and incorporates each allegation in paragraphs 1 through 131 as if fully set forth herein and further alleges as follows:

171.    By virtue of the acts described above, Defendants have "knowingly ma[de], use[d] or cause[d] to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof, or

39

knowingly conceal[ed] or knowingly and improperly avoid[ed] or decrease[d] an obligation to pay or transmit money or property to the commonwealth or a political subdivision thereof" in violation of Mass. Gen. Laws c. 12, sec. 5B(a)(9).

172.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

173.    Pursuant to Mass. Gen. Laws c. 12, sec. 5B(a), the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus a penalty of $5,500 to $21,563 per violation.

**Count IX**
**Massachusetts False Claims Law**
**Mass. Gen. Laws ch. 12, sec. 5B(a)(10)**

174.    Relator re-alleges and incorporates each allegation in paragraphs 1 through 131 as if fully set forth herein and further alleges as follows:

175.    By virtue of the acts described above, Defendants are "beneficiar[ies] of an inadvertent submission of a false claim to the commonwealth or a political subdivision thereof, or [beneficiaries] of an overpayment from the commonwealth or a political subdivision thereof, and … subsequently discover[ed] the falsity of the claim or the receipt of overpayment and fail[ed] to disclose the false claim or receipt of overpayment to the commonwealth or a political subdivision by … the date which is 60 days after the date on which the false claim or receipt of overpayment was identified…." in violation of Mass. Gen. Laws c. 12, sec. 5B(a)(10).

176.    By reason of Defendants' acts, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

177.    Pursuant to Mass. Gen. Laws c. 12, sec. 5B(a), the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus a penalty of $5,500 to $21,563 per violation.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator demands that judgment be entered in favor of the United States and the Commonwealth of Massachusetts and against Defendants for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count.  This request includes three times the amount of damages to the United States plus civil penalties for each false claim, and any other recoveries or relief provided for under the FCA and the MA FCA.

Further, Relator requests that he receive the maximum amount permitted by law from the proceeds or settlement of this action as well as from any alternative remedies collected by the United States and the Commonwealth of Massachusetts, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs.  Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities who are not parties to this action.

**DEMAND FOR JURY TRIAL**

A jury trial is demanded in this case.

DATED:  March 18, 2025                                    Respectfully submitted,

                                                                              SHAPIRO & TEITELBAUM LLP

                                                                               By:   /s/ Jonathan Shapiro
                                                                                       Jonathan Shapiro (BBO No. 454220)

                                                                              Mia Teitelbaum (BBO No. 693595)
                                                                              55 Union Street
                                                                              4th Floor
                                                                              Boston, MA 02108
                                                                              (617) 742-5800
                                                                              jshapiro@jsmtlegal.com
                                                                              mteitelbaum@jsmtlegal.com

                                                                              Jeanne A. Markey
                                                                              Gary L. Azorsky
                                                                              Raymond M. Sarola
                                                                              COHEN MILSTEIN SELLERS & TOLL PLLC
                                                                              100-120 N. 18th Street
                                                                              Suite 1820
                                                                              Philadelphia, PA 19103
                                                                              (267) 479-5700
                                                                              jmarkey@cohenmilstein.com
                                                                              gazorsky@cohenmilstein.com
                                                                              rsarola@cohenmilstein.com

                                                                              Michael J. Brevda
                                                                              David J. Brevda
                                                                              SENIOR JUSTICE LAW FIRM
                                                                              7700 Congress Avenue, Suite 3216
                                                                              Boca Raton, FL 33487
                                                                              (561) 717-0813
                                                                              michael@seniorjustice.com
                                                                              david@seniorjustice.com
                                                                              eservice@seniorjustice.com

                                                                              *Counsel for Relator*

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants on March 18, 2025.

   /s/ Jonathan Shapiro